Richard R. Best
Lara Shalov Mehraban
Celeste A. Chase
Christopher J. Dunnigan
Ibrahim Sajalieu Bah
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0061 (Dunnigan)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,   :
   :
            Plaintiff,   :
   :   **COMPLAINT**
   -against-   :
   :   **20-CV-10051**
RAQUEL MOURA BORGES and   :
GLOBAL ACCESS INVESTMENT ADVISOR, LLC,   :
   :   **JURY TRIAL**
            Defendants.   :   **DEMANDED**
-------------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Raquel Moura Borges ("Borges") and Global Access Investment Advisor, LLC,

("Global Access") (collectively "Defendants") alleges as follows:

## SUMMARY

1.      Between 2013 and 2018 ("the Relevant Period"), Defendants Borges, a Brazilian

national, and her New York-based investment adviser Global Access defrauded at least 8 clients by

misappropriating client assets for the use of Borges, Global Access, and certain other clients of

Global Access. Defendants used several schemes to commit the fraud, including:

- Directing the sale of securities in client accounts in order to misappropriate the
  proceeds;

- Arranging for loans against securities in client accounts (which eventually necessitated their sale), and then misappropriating the proceeds of the loans; and

- Directly misappropriating client funds intended for investment by writing checks to Borges and otherwise using client funds for Global Access's operations.

2.     Defendants attempted to conceal their fraudulent misappropriation of assets by sending their clients portfolio statements and bank documents showing inaccurate balances in client accounts. All told, instead of managing and investing client funds Defendants misappropriated at least $11 million from their advisory clients. This misappropriation included the use of client funds to purchase real estate in Manhattan for Borges's personal benefit.

## VIOLATIONS

3.     By virtue of the conduct alleged here, Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; in the alternative, defendant Borges has aided and abetted violations of Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b-5 by Global Access; defendant Borges is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for violations of Exchange Act Section 10(b) and Rule 10b-5 by Global Access; Defendants have violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]; and defendant Borges has aided and abetted Global Access' violations of Sections 206(1) and 206(2) of the Advisers Act.

4.     Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.      The Commission brings this action under Securities Act Section 20(b) & 20(d) [15 U.S.C. § 77t(b) & (d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Section 209(d) & (e) [15 U.S.C. § 80b-9(d) & (e)].

6.      The Commission seeks to permanently enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and seeks an order requiring Defendants to disgorge all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest. The Commission also seeks civil penalties against Defendants under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. §§ 80b-9(e)]; and any other further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

7.      The Commission brings this action under the authority conferred by Securities Act Section 20 [15 U.S.C. § 77t(b)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

8.      This Court has jurisdiction and venue over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. Additionally, certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York. For example, Global Access's offices were within the Southern District of New York,

Borges met with clients within this District, and Borges purchased an apartment in her own name using client funds in this District.

## FACTS

### I. DEFENDANTS

9.      **Borges**, age 54, is a citizen of Brazil, and a resident of Sao Paulo, Brazil. During the Relevant Period, Borges was a part-time resident of New York, New York and Sao Paulo, Brazil. Borges is the founder, sole owner, President, and Chief Compliance Officer of defendant Global Access. Borges attended law school in Brazil, and passed the bar exam in Brazil in 1992.

10.      **Global Access** is an investment adviser headquartered in New York City, and is not registered with the Commission. Global Access was registered with the State of New York as an investment adviser from 2011 to 2018. Global Access provides investment advisory services to clients who are primarily from Brazil.

### II. OTHER RELEVANT ENTITIES

11.      **Global Access Investment Adviser Brasil S/S Ltda ("Global Access Brazil"),** is an affiliate of defendant Global Access. Global Access Brazil is based in Sao Paulo, Brazil, and is an investment advisory firm organized under the laws of Brazil.

12.      **Kinao Corp.** is a British Virgin Islands corporation affiliated with Global Access. Borges is its director.

13.      **52nd East Property Management LLC** is a New York company controlled by Borges.

14.      **Access Property Management, LLC ("APM")** was organized under the laws of Delaware with its primary place of business in New York, NY. It is owned or controlled by Borges.

III.   **OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEMES TO MISAPPROPRIATE CLIENT ASSETS**

15.     Defendants provided financial services as investment advisers to a number of clients who were citizens and residents of Brazil. These services included, but were not limited to providing investment advice and arranging for the purchase and sale of securities, often using Defendants' discretion.

16.     Between January 2013 and September 2018, Defendants defrauded four client families ("Client Families A-D), one entity investor ("Entity Client E") and two other apparent investors, one of whom appears to be an individual and one of whom appears to be an entity ("Clients F-G") using a variety of schemes.

IV.   **MISAPPROPRIATION OF ASSETS FROM CLIENT FAMILY A**

17.     Client Family A consisted of a father and son in Brazil, who became advisory clients of Borges in 1999. Three corporations were established in the British Virgin Islands to hold certain of Client Family A's assets.

18.     When Client Family A became advisory clients of Defendants, they informed Defendants that they only wanted low risk investments in mutual funds, stocks, and bonds.

19.     Client Family A invested approximately $10 million to be managed by Borges.

20.     Borges opened securities accounts in the name of the three corporations at three financial institutions in Switzerland. Borges, Global Access, or Global Access Brazil had discretionary authority to purchase or sell securities in Client Family A's accounts, but not to withdraw funds from the accounts.

21.     During the Relevant Period, Defendants misappropriated at least $4.4 million from Client Family A through several schemes:

22.     First, Defendants misappropriated funds to pay Borges and to cover Global Access's expenses. On April 19, 2016, Borges emailed a financial institution in Switzerland that held some of

5

Client Family A's assets. Borges represented that Client Family A was going to use funds in their account to invest in a rental apartment in Manhattan, New York. Borges attached a forged letter of authorization instructing the Swiss financial institution to transfer $350,000 to Global Access's U.S. bank, representing that the account owned by Client Family A was in fact purchasing shares in a rental property. Defendants misappropriated the $350,000, using the funds to pay Borges directly and to cover Global Access's expenses unrelated to Client Family A.

23.     Second, Defendants misappropriated loan proceeds to renovate property for the benefit of Borges. On July 13, 2016, Borges sent an email to a financial institution in Switzerland, claiming that Client Family A needed $1.5 million for real estate investments and renovations.

24.     On August 18, 2016, Borges sent a letter to the financial institution in Switzerland, representing that Client Family A was buying a duplex penthouse on East 52nd Street, Manhattan, New York, which would be administered by Global Access via an entity named "East 52nd Property Management LLC." The letter contained a forged signature of a member of Client Family A, directed the Swiss financial institution to make a loan against the securities in an account held in the name of one of Client Family A's British Virgin Islands ("BVI") corporations.

25.     On August 23, 2016, Global Access received approximately $1.95 million from the financial institution in Switzerland, from Client Family A's assets, with the wire transfer identifying the transaction as "Shares Purchase: 52nd East."

26.     On August 23, 2016, Defendant Borges wrote herself a check for $1.5 million from Global Access's bank account. The check contained the notation "RB's new house."

27.     Third, Defendants misappropriated additional funds for Borges and Global Access. On June 22, 2017, Borges directed a financial institution in Switzerland to sell certain bonds in Client Family A's account. Borges then used the proceeds of this sale to transfer approximately

$85,000 to Global Access. Borges immediately transferred $20,000 of this amount to herself, and another $20,000 to Global Access Brazil.

28.     On August 25, 2017, Borges again emailed a financial institution in Switzerland, instructing that $80,000 be transferred from Client Family A's account to an account of APM, purportedly to purchase property in the U.S. for a Client Family A member.

29.     The instruction included an operating agreement and other documents purportedly signed by a member of Client Family A pertaining to Client Family A's account. The documents included a false representation that a member of Client Family A owned APM. The signatures on the documents were forged.

30.     Defendants then misappropriated the $80,000, by transferring $25,000 to Global Access and used the remaining funds to cover expenses unrelated to Client Family A.

31.     Finally, between September 2013 and February 2016, Defendants misappropriated at least $1.8 million from Client Family A by transferring funds from Client Family A's accounts to bank accounts in Curacao either owned by Borges or to Kinao Corp., which Borges controlled.

32.     Wire transfer instructions to the financial institution that Borges sent instruction to contain notations such as "transfer to my own account" and "fund my company." Another notation falsely stated that the transfer to Kinao Corp. was for "repayment of loan linked to Hotel Bourbon investments." Client Family A had no interest in Kinao Corp. and Kinao Corp. did not have any interest in any "Hotel Bourbon" investments.

## A. Defendants' Attempt to Conceal Their Fraud From Client Family A

33.     Defendants attempted to conceal their fraud from Client Family A by sending them forged bank account statements and false portfolio statements. In 2016, Borges provided Client Family A an account statement from a Swiss financial institution showing a balance of $7.36 million. In 2017, Defendants sent another false account statement showing that Client Family A held an

additional $8.02 million in a different financial institution. At the time the account had a zero balance, because it had never been funded. In late 2016 and early 2017, Defendants provided Client Family A at least three account statements at another Swiss financial institution showing a balance of approximately $200,000. At the time these statement were sent, this account had almost no assets.

34.     Borges specifically told one member of Client Family A to not contact custodial financial institutions directly, but to go through Global Access.

### B. Borges's Confession to Client Family A

35.     In 2017, Client Family A decided to repatriate their assets to Brazil, via a bank in Miami. Global Access sent a member of Client Family A a portfolio statement showing a balance of $14.2 million in assets. Client Family A attempted to transfer the entire amount to the bank in Miami.

36.     On October 16, 2017, Client Family A's bank account in Miami received a transfer of $4,357.00. Client Family A inquired as to where the remainder of the money was. On October 25, 2017, Borges emailed a member of Client Family A, asking him to "stay calm, because anyway your amount is owed. I assure you."

37.     On October 30, 2017, at a meeting in Brazil, Borges confessed that Client Family A's assets were gone, and that Borges had falsified account statements, and had used Client Family A's funds to cover losses of other clients.

38.     This October 30, 2017 meeting was attended by Borges, a member of Client Family A, an attorney for Client Family A, and an employee of Global Access Brazil.

## V.   MISAPPROPRIATION OF ASSETS FROM CLIENT FAMILY B

39.     Beginning in 1999, Client Family B (a husband and wife) began investing with Defendants. Client Family B had accounts in their own names and in the names of two BVI corporations. These accounts were held at financial institutions in Switzerland and the United States.

Borges, Global Access, or Global Access Brazil had discretionary authority over Client Family B's accounts.

40.     Defendants misappropriated at least $3.7 million from Client Family B.

41.     In March 2015, Borges directed the sale of two bonds held in an account in the name of Client Family B. The two bonds netted over $361,000 for Client Family B, which was eventually misappropriated.

42.     On June 8, 2015, a Global Access Brazil employee sent an email to one of the financial institutions in Switzerland that held Client Family B's accounts. Borges was copied on the email. The email attached a forged letter that purported to be from a member of Client Family B which stated:

> "I'm renovating my Real Estate in New York (at 308 East 52nd Street New York New York 1022) through Global Access Investment for a total amount of USD 450,000.00 (Four Hundred Fifty Thousand dollars). As you can see the attached proposal."

The letter directed the transfer of $450,000 in four monthly installments to a bank account in the name of Global Access.

43.     In fact, no member of Client Family B signed the June 8, 2015 letter.

44.     Borges diverted approximately $360,000 of the $450,000 to her personal bank accounts. The remaining $90,000 was used to fund Global Access.

45.     In late 2017, at Borges's request, Client Family B transferred approximately $2.9 million from accounts based in Switzerland to an account in the United States.

46.     Once the account was funded with cash, Borges arranged for the account to purchase mutual funds. Borges also directed the sale of securities in the account.

47.     Borges arranged for a line of credit to the account owned by Client Family B, secured by the cash and securities in the account.

48.     In late 2017, Borges represented to a member of Client Family B that they could earn a 12% annual return on investments in real estate.

49.     Client Family B signed three promissory notes and supporting documents totaling $2.7 million, authorizing Borges to invest in a private real estate investment.

50.     Borges misappropriated approximately all of the $2.7 million through the following methods:

- Borges wired $272,000 to a bank in Panama with the notation "gift or donation;"

- Borges transferred over $888,000 to a BVI entity unaffiliated with Client Family B, with the notation "return of investments in reits [real estate investment trusts];"

- Borges transferred over $900,000 to another client of Global Access, with the notation "property purchase payment;"

- Borges paid approximately $210,000 to an interior designer to remodel property owned by Borges, and

- Borges used the remainder of Client Family B's funds to pay Global Access's expenses.

51.     None of the above expenditures resulted in Client Family B gaining an interest in any real estate.

A.     **Defendants' Attempts to Conceal Their Fraud From Client Family B**

52.     Defendants attempted to conceal their fraud from Client Family B by sending a forged bank account statement and private placement document.

53.     Additionally, Borges informed Client Family B in or around May 2018 that she had not invested their $2.7 million in real estate assets as promised, but in a private placement with a Brazilian company.

54.     A relative of Client Family B contacted the Brazilian company and was told no such investment existed.

55.     In an effort to conceal the fraud from Client Family B, Borges sent at least one forged bank statement and private placement document to Client Family B, purportedly showing that the investment in the Brazilian company had actually taken place.

## VI.   MISAPPROPRIATION OF ASSETS FROM CLIENT FAMILY C

56.     Between 1999 and 2018, Defendants managed assets for Client Family C, held in the name of two BVI corporations at a banks in Switzerland and the United States.

57.     Between February 2014 and August 2018, Global Access's United States bank accounts, and other accounts owned or controlled by Borges, received at least $2.7 million from Client Family C's accounts. Defendants misappropriated almost all of these funds.

58.     Defendants did so by transferring these funds either directly to Borges, indirectly to Borges via entities she owned or controlled, or by having Global Access use the funds for operating expenses, and by transferring Client Family C's funds to other clients of Global Access.

## VII.   MISAPPROPRIATION OF ASSETS FROM CLIENT FAMILY D

59.     Between October 2000 and September 2017, Defendants managed assets for Client Family D, whose assets were located in a BVI entity with an account at a bank in Switzerland. Borges, Global Access, or Global Access Brazil had discretionary authority to purchase or sell securities in Client Family D's account, but did not have authority to withdraw funds.

60.     In April 2016, Borges instructed a financial institution in Switzerland to sell bonds and American Depository Receipts in Client Family D's account. Defendants then misappropriated at least $350,000 from Client Family D.

## VIII.   MISAPPROPRIATION OF ASSETS FROM ENTITY CLIENT E

61.     In September 2016, Global Access received transfers of over $1.6 million from Entity Client E, whose assets were held in a BVI corporation, for investment in New York real estate.

62.     Borges directly transferred almost all of the $1.6 million to her personal checking account, including a $1 million check with a notation on the check "Transfer to RB's account."

## IX.   MISAPPROPRIATION OF ASSETS FROM APPARENT CLIENTS F & G

63.     In November 2016, two apparent clients of Global Access transferred a total of approximately $1.45 million to Global Access for investment in New York real estate.

64.     Borges misappropriated almost all of these funds by writing two checks to her personal bank account.

## X.   BORGES'S PURCHASE OF MANHATTAN REAL ESTATE WITH CLIENT ASSETS

65.     In February through March 2017, using investor funds, Borges purchased an apartment in Manhattan, New York, for approximately $4.5 million. Ownership of the apartment is currently in Borges's own name.

### FIRST CLAIM FOR RELIEF
### VIOLATIONS OF SECURITIES ACT SECTION 17(A)(1),17(A)(2), & 17(A)(3)
### (AGAINST BOTH DEFENDANTS)

66.  The Commission realleges and incorporates by reference here the allegations in paragraphs 1-2, 9-10, 15-55, and 59-60.

67.  Defendants Borges and Global Access, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

68. By reason of the foregoing, Defendants Borges and Global Access, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Securities Act Section 17(a)(1), (2), & (3) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### VIOLATIONS OF EXCHANGE ACT SECTION 10(B) AND RULE 10B-5 THEREUNDER (AGAINST BOTH DEFENDANTS)

69. The Commission realleges and incorporates by reference here the allegations in paragraphs 1-2, 9-10, 15-55, and 59-60.

70. Defendants Borges and Global Access, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

71. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### IN THE ALTERNATIVE, AIDING AND ABETTING VIOLATIONS OF SECURITIES ACT SECTION 17(A) (AGAINST BORGES)

72. The Commission realleges and incorporates by reference here the allegations in paragraphs 1-2, 9-10, 15-55, and 59-60.

73. As alleged above, Global Access violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

74. Borges knowingly or recklessly provided substantial assistance to Global Access with respect to the violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] by each of them.

75. By reason of the foregoing, Borges is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Global Access' violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### FOURTH CLAIM FOR RELIEF
#### IN THE ALTERNATIVE, AIDING AND ABETTING VIOLATIONS OF EXCHANGE ACT SECTION 10(B) AND RULE 10B-5 (AGAINST BORGES)

76. The Commission realleges and incorporates by reference here the allegations in paragraphs 1-2, 9-10, 15-55, and 59-60.

77. As alleged above, Global Access violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

78. Borges knowingly or recklessly provided substantial assistance to Global Access with respect the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by each of them.

79. By reason of the foregoing, Borges is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Global Access' violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FIFTH CLAIM FOR RELIEF
#### CONTROL PERSON LIABILITY FOR VIOLATIONS OF EXCHANGE ACT SECTION 10(B) AND RULE 10B-5 (AGAINST BORGES)

80. The Commission realleges and incorporates by reference here the allegations in paragraphs 1-2, 9-10, 15-55, and 59-60.

81. As alleged above, Global Access violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

82. During the Relevant Period, Borges controlled Global Access and was a culpable participant in its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

83. By reason of the foregoing, Borges is liable as a controlling person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by Global Access.

## SIXTH CLAIM FOR RELIEF
### VIOLATIONS OF SECTION 206(1) & (2) OF THE ADVISERS ACT (BOTH DEFENDANTS)

84. The Commission realleges and incorporates by reference here the allegations in paragraphs 1-2, 9-10, and 15-64.

85. Defendants directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, while acting as an investment adviser within the meaning of Section 202(11) of the Advisers Act [ 15 U.S.C. § 80b-2(11)], has: (a) employed, and/or is employing, devices, schemes, and artifices to defraud a client or prospective client; and. (b) engaged, and/or is engaging, in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

86. By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## SEVENTH CLAIM FOR RELIEF
### IN THE ALTERNATIVE, AIDING AND ABETTING VIOLATIONS OF VIOLATIONS OF SECTIONS 206(1) & (2) OF THE ADVISERS ACT (BORGES)

87. The Commission realleges and incorporates by reference here the allegations in paragraphs 1-2, 9-10, and 15-64.

88. As alleged above, Global Access violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

89. Borges knowingly or recklessly provided substantial assistance to Global Access's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

90. By reason of the foregoing, Borges is liable for aiding and abetting Global Access's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court grant the following relief:

### I.

A Final Judgment finding that the Defendants violated the securities laws and rules promulgated thereunder as alleged against him herein;

### II.

A Final Judgment permanently restraining and enjoining the Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### III.

A Final Judgment permanently restraining and enjoining the Defendants, and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

**IV.**

A Final Judgment directing the Defendants to disgorge their ill-gotten gains, plus

prejudgment interest;

**V.**

Enter a Final Judgment imposing civil money penalties upon Defendants pursuant to

Section 20(d) of the Securities Act [ 15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [ 15

U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

**VI.**

Such other and further relief the Court deems just and proper.


Dated:  New York, New York
      December 1, 2020

*Richard R. Best*
_____
Richard R. Best
Lara Shalov Mehraban
Celeste A. Chase
Christopher J. Dunnigan
Ibrahim Sajalieu Bah
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0061 (Dunnigan)
dunnigancj@sec.gov